UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DAN CAPEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | 1:23-cv-02458-MHC-JEM |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FULLSTORY, INC., SCOTT VOIGT, | ) | |
| and GABBY SIRNER-COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FULLSTORY, INC.'S PARTIAL ANSWER AND DEFENSES
TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS OF
DEFENDANT FULLSTORY, INC.**

COMES NOW Defendant FullStory, Inc. ("FullStory" or the "Company"), by

and through undersigned counsel, hereby files its Answer and Defenses to Count A

(Title VII Discrimination) and Count B (Title VII Failure to Accommodate) of

Plaintiff Dan Capel's ("Plaintiff" or "Capel") Complaint ("Compl.") [ECF No. 1],

and FullStory's Counterclaims, showing this Court as follows:[1]

---

[1]    FullStory files this Partial Answer and Defenses subject to its Partial Motion
to Dismiss Count C (Defamation/Libel by Sirner-Cohen's email to FullStory's
employees), Count D (Defamation/Slander by Voigt's statement to FullStory's
employees), Count E (Defamation/Libel by FullStory to Capel's new employer) of
Plaintiff's Complaint.  Accordingly, FullStory hereby responds only the general
allegations set forth in Plaintiff's Complaint, as well as the factual averments and
other allegations pertaining to Plaintiff's claims that are not addressed in FullStory's

## AFFIRMATIVE AND OTHER DEFENSES

FullStory asserts the following affirmative and other defenses to Plaintiff's Complaint without assuming any burdens of protection, persuasion, or proof that, pursuant to law, are not legally assigned to Defendant and are Plaintiff's burden of proof. FullStory reserves the right to assert additional defenses that become available or apparent during the course of discovery, as well as the right to amend its Answer.

## FIRST DEFENSE

To the extent Plaintiff failed to comply with the enforcement provision of Title VII, some or all of Plaintiff's claims are barred, in whole or in part, for failure to exhaust his administrative remedies.

## SECOND DEFENSE

To the extent Plaintiff failed to satisfy all conditions precedent to filing suit under Title VII, including a request for accommodation, his claims are barred.

---

Partial Motion to Dismiss. FullStory explicitly reserves its right to respond to Count C (Defamation/Libel by Sirner-Cohen's email to FullStory's employees), Count D (Defamation/Slander by Voigt's statement to FullStory's employees), Count E (Defamation/Libel by FullStory to Capel's new employer) of Plaintiff's Complaint as otherwise may be required pursuant to Federal Rule of Civil Procedure 12.

## THIRD DEFENSE

To the extent Plaintiff's Complaint asserts or attempts to assert claims under Title VII other than those contained in Plaintiff's Charges of Discrimination, such claims are barred.

## FOURTH DEFENSE

Plaintiff cannot recover against FullStory to the extent that his own actions or omissions, or other intervening or superseding causes of which FullStory had no control, were the sole, proximate, and legal cause of any injuries or damages allegedly suffered, which cannot form the basis for any liability on the part of FullStory.

## FIFTH DEFENSE

Plaintiff failed to exercise reasonable diligence to mitigate his alleged damages.  FullStory is entitled to a set-off for any and all amounts which Plaintiff has earned or could have earned in mitigation of his claimed damages.

## SIXTH DEFENSE

Plaintiff cannot demonstrate that FullStory treated him differently than similarly situated individuals on the basis of religious beliefs.

## SEVENTH DEFENSE

FullStory relied on legitimate business reasons unrelated to Plaintiff's membership in a protected class in making all employment decisions affecting him.

## EIGHTH DEFENSE

FullStory acted in good faith and without malice or reckless disregard for Plaintiff's rights.  Plaintiff is, therefore, not entitled to punitive damages.

## NINTH DEFENSE

All statements alleged in the Complaint as attributable to FullStory are privileged communications not subject to a claim for which relief can be granted.

## TENTH DEFENSE

Plaintiff's claims fail because either FullStory never made the alleged defamatory statements, or any statements that were made about Capel by FullStory were true and/or privileged.

## ELEVENTH DEFENSE

Plaintiff has not suffered any legally cognizable damage.

## **TWELFTH DEFENSE**

As discovery proceeds, FullStory reserves the right to raise the defense of after-acquired evidence.

### **RESPONSES TO SPECIFIC ALLEGATIONS CONTAINED IN PLAINTIFF'S COMPLAINT**

FullStory responds to the allegations contained in the numbered and unnumbered paragraphs of Plaintiff's Complaint as follows:

1.     ANSWER:   FullStory denies the allegations in Paragraph 1 of the Complaint.

2.     ANSWER:   FullStory denies the allegations in Paragraph 2 of the Complaint.

3.     ANSWER:   FullStory denies the allegations in Paragraph 3 of the Complaint.

4.     ANSWER:   FullStory denies the allegations in Paragraph 4 of the Complaint.

5.     ANSWER:   FullStory denies the allegations in Paragraph 5 of the Complaint.

6.     ANSWER:   FullStory denies the allegations in Paragraph 6 of the Complaint.

7.     ANSWER:   FullStory denies the allegations in Paragraph 7 of the Complaint, except to admit that Capel made "deeply problematic" statements regarding the LGBTQ+ community and statements that were "harmful to the transgender and non-binary communities" which violated FullStory's social media policies.

8.     ANSWER:   FullStory denies the allegation in Paragraph 8 of the Complaint that FullStory and Voigt defamed Capel, but admit that the parties stated that Capel made transphobic comments.

9.     ANSWER:  FullStory admits that Capel was asked to add a disclaimer to certain online posts but denies the other allegations in Paragraph 9 of the Complaint.

10.    ANSWER:   FullStory denies the allegations in Paragraph 10 of the Complaint, except to admit that Plaintiff purports to bring claims under the statutes cited in Paragraph 10 of the Complaint and that the Court has jurisdiction over this matter.  FullStory denies that it violated any of the statutes referenced in Paragraph 10, or any other law, with respect to Plaintiff.

11.    ANSWER:  FullStory admits the Court has jurisdiction over this matter, but denies that it violated any law with respect to Plaintiff.

12.   ANSWER:  FullStory admits the Court has authority to award relief under the statutes cited in Paragraph 12 of the Complaint but denies that it violated any law with respect to Plaintiff or that Plaintiff is entitled to any damages.

13.   ANSWER:  FullStory admits venue is proper in this Court but denies that it violated any law with respect to Plaintiff.

14.   ANSWER:   FullStory admits that Plaintiff filed a Charge of Discrimination with the EEOC against FullStory on or around September 8, 2022. FullStory lacks knowledge or information sufficient to form a belief as to the truth of when Plaintiff received a Notice of Right to Sue from the EEOC and, on that basis, denies it.  FullStory denies each and every remaining allegation in Paragraph 14 and Footnote 1 of the Complaint.

15.   ANSWER:   FullStory admits Plaintiff's employment with the Company terminated in July of 2022.  FullStory lacks knowledge or information sufficient to form a belief as to the truth for the remaining allegations in Paragraph 15 of the Complaint and, on that basis, denies each and every remaining allegation in Paragraph 15 of the Complaint.

16.   ANSWER:  FullStory has waived service in this action.  [*See* ECF No. 8].  FullStory admits the allegations in Paragraph 16 of the Complaint.

17.     ANSWER:  Ms. Sirner-Cohen has waived service in this action.  [*See* ECF No. 9].  FullStory admits that Ms. Sirner-Cohen works at FullStory, but denies that her title is Human Resources Director as alleged in Paragraph 17 of the Complaint.

18.     ANSWER:  Mr. Voigt has waived service in this action.  [*See* ECF No. 10].  FullStory admits the other allegations in Paragraph 18 of the Complaint.

19.     ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint and, on that basis, denies them.

20.     ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint and, on that basis, denies them.

21.     ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint and, on that basis, denies them.

22.     ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint and, on that basis, denies them.

23.    ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint and, on that basis, denies them.

24.    ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint and, on that basis, denies them.

25.    ANSWER:  FullStory admits that in its position paper to the EEOC the Company included the following language, "[m]ost members of management knew that Capel was a religious member of the Church of Latter-Day Saints[.]"  FullStory denies each and every remaining allegation contained in Paragraph 25 of the Complaint.

26.    ANSWER:  FullStory admits the allegations in Paragraph 26 of the Complaint.

27.    ANSWER:   FullStory avers that the LinkedIn posts speak for themselves, attached hereto as Exhibit A.  Answering further, FullStory denies each and every remaining allegation contained in Paragraph 27 of the Complaint.

28.    ANSWER:   FullStory avers that the LinkedIn posts speak for themselves, *see id*.  Answering further, FullStory denies each and every remaining allegation contained in Paragraph 28 of the Complaint.

29.    ANSWER:    FullStory avers that the LinkedIn posts speak for themselves, *see id.*

30.    ANSWER:    FullStory avers that the LinkedIn posts speak for themselves, *see id.*

31.    ANSWER:    FullStory avers that the LinkedIn posts speak for themselves, *see id.*  Answering further, FullStory denies each and every remaining allegation contained in Paragraph 31 of the Complaint.

32.    ANSWER:  FullStory does not have sufficient information to know if Mr. Ouellette was the first to call Capel, but admits that Mr. Ouellette called Capel to discuss the posts and told him that the posts were causing problems internally and with customers and prospects.  FullStory denies the other allegations in Paragraph 32 of the Complaint.

33.    ANSWER:  FullStory does not have sufficient information to admit or deny whether it was "[w]ithin the hour" but otherwise admits the allegations in Paragraph 33 of the Complaint.

34.    ANSWER:  FullStory admits that Genna Weinstein discussed the posts with Capel.  FullStory denies each and every remaining allegation contained in Paragraph 34 of the Complaint.

35.     ANSWER:  FullStory admits that Weinstein texted Capel to set up a call and during that call, in which FullStory's counsel participated, Capel was told he would need to: (i) remove the problematic comments from his post (but not the original post); (ii) remove another post Capel made on Facebook; (iii) move to a non-manager role; (iv) apologize to FullStorians; and (v) attend inclusivity training. FullStory denies each and every other allegation contained in Paragraph 35 of the Complaint.

36.     ANSWER:  FullStory admits that Capel posted a link to an article about transgender issues, but denies the other allegations in Paragraph 36 of the Complaint.

37.     ANSWER:  FullStory admits that Capel asked Weinstein to send the requirements for his continued employment in writing, that she did, and that Weinstein told Capel, in response to his refusal to accept any of the terms, that she would start the offboarding and termination process.  FullStory denies the other allegations in Paragraph 37 of the Complaint.

38.     ANSWER:  FullStory admits that it sent Capel an email explaining the requirements for continued employment, and denies the other allegations in Paragraph 38 of the Complaint.

39.     ANSWER:  FullStory admits that it has policies in its handbook but denies the other allegations in Paragraph 39 of the Complaint.

40.   ANSWER: FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint and, on that basis, denies them.

41.   ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint and, on that basis, denies them.

42.   ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint and, on that basis, denies them.

43.   ANSWER:   FullStory avers that the LinkedIn posts speak for themselves, *see* Exhibit A.  Answering further, FullStory denies each and every remaining allegation contained in Paragraph 43 and Footnote 4 of the Complaint.

44.   ANSWER:  FullStory does not answer the allegations in Paragraphs 44-53 of the Complaint because they are the subject of the Defendants' Motions to Dismiss.

45.   ANSWER:  FullStory denies the allegations in Paragraph 54 of the Complaint.

46.   ANSWER: FullStory admits that Capel's base salary during his last year of employment with FullStory was about $200,000, that his bonus was about

$200,000, and his benefits were about $25,000.   FullStory denies the other allegations in Paragraph 55 of the Complaint.

47.   ANSWER:  FullStory denies the allegations in Paragraph 56 of the Complaint.

48.   ANSWER:  FullStory denies the allegations in Paragraph 57 of the Complaint.

49.   ANSWER:  FullStory incorporates its responses contained in all of the preceding paragraphs as if fully set forth herein.

50.   ANSWER:  Paragraph 59 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 59 of the Complaint.

51.   ANSWER: FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 of the Complaint and, on that basis, denies them.

52.   ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 of the Complaint and, on that basis, denies them.

53.   ANSWER:  FullStory denies the allegations in Paragraph 62 of the Complaint.

54.     ANSWER:  Paragraph 63 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 63 of the Complaint.

55.     ANSWER: Paragraph 64 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 64 of the Complaint.

56.     ANSWER:  Paragraph 65 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 65 of the Complaint.

57.     ANSWER:  Paragraph 66 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 66 of the Complaint.

58.     ANSWER:  FullStory incorporates its responses contained in all of the preceding paragraphs as if fully set forth herein.

59.     ANSWER:  Paragraph 68 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 68 of the Complaint.

60.     ANSWER: FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 of the Complaint and, on that basis, denies them.

61.     ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 of the Complaint and, on that basis, denies them.

62.     ANSWER:  FullStory denies the allegations in Paragraph 71 of the Complaint.

63.     ANSWER:  Paragraph 72 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 72 of the Complaint.

64.     ANSWER: Paragraph 73 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 73 of the Complaint.

65.     ANSWER:  FullStory denies the allegations in Paragraph 74 of the Complaint.

66.     ANSWER:  Paragraph 75 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 75 of the Complaint.

67.    ANSWER:  Paragraph 76 of the Complaint contains legal assertions or conclusions to which no response is required; to the extent a response is required, FullStory denies the allegations in Paragraph 76 of the Complaint.

68.    ANSWER:  FullStory incorporates its responses contained in all of the preceding paragraphs as if fully set forth herein.

69.    ANSWER:  FullStory states that it is not required to answer the allegations in Paragraphs 78-122 of the Complaint because they are the subject of pending Motions to Dismiss.

ANSWER:  FullStory incorporates its responses contained in all of the preceding paragraphs as if fully set forth herein.

70.    ANSWER:  FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 of the Complaint and, on that basis, denies them.

71.    ANSWER: FullStory lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 of the Complaint and, on that basis, denies them.

In response to the Paragraph beginning with "Wherefore" on page 38 of Plaintiff's Complaint, FullStory denies that Plaintiff is entitled to any of the relief sought through that Paragraph, including Subparagraphs (1) – (9) thereof, noting that

there are two Subparagraphs (6), and FullStory states affirmatively that Plaintiff is not entitled to any relief in this action whatsoever, whether at law, in equity, or otherwise.

FullStory hereby denies any and all liability to Plaintiff.  Any allegation not responded to above is hereby denied.

**WHEREFORE**, having answered the Complaint of Plaintiff Dan Capel, Defendant FullStory, Inc. respectfully requests that this Court enter judgment in favor against Plaintiff; that Plaintiff take nothing by reason of his Complaint; that this action be dismissed, with prejudice, on its merits as a matter of law; that all costs be cast against Plaintiff; and that FullStory, Inc. be awarded its reasonable attorneys' fees, expenses, and costs, as well as any other relief to which it is entitled to receive at law, in equity, or otherwise.

## COUNTERCLAIMS OF FULLSTORY, INC. AGAINST DAN CAPEL AND APPLICATION FOR PERMANENT INJUNCTIVE RELIEF

COMES NOW FullStory, Inc. ("FullStory" or the "Company"), without waiving any above-stated defenses, and files this Counterclaim and Application for Permanent Injunctive Relief against Dan Capel ("Capel" or "Counter-Defendant Capel"), showing this Court as follows:

## PRELIMINARY STATEMENT

1.     This matter arises from Capel's brazen and improper retention of FullStory's "Confidential Information" and "Trade Secrets" (as defined and referenced in Capel's Employment Covenants Agreement (the "ECA") and the Company's Employee Handbook ("the Handbook") and Information Security Policy (the "ISP")) contained in hundreds of files during and after his employment with FullStory.  A true and correct copy of the ECA is attached hereto as Exhibit B. A true and correct copy of the relevant sections of the Employee Handbook in effect at the time Capel was employed with FullStory, the terms of which Capel accepted, is attached hereto as Exhibit C.  A true and correct copy of the ISP is attached hereto as Exhibit D.  Without permission and in violation of FullStory Handbook, policies, and his contractual obligations, Capel uploaded and stored FullStory Trade Secrets and Confidential Information, including sensitive customer files to his own personal iCloud server.  FullStory initially learned of this improper retention months after

Capel's employment with FullStory ended.  Only after Capel became employed by another company in December 2022, Capel's counsel informed FullStory that Capel was still in possession of company documents on his personal iCloud server.  Shortly after, Capel's counsel notified FullStory that Capel was to begin working as a sales representative in the southeastern United States for a direct competitor, Contentsquare.  Capel breached his post-termination obligations under the ECA, Handbook, and ISP by retaining these files.  FullStory has tried to negotiate with Capel about the safe return and protection of FullStory's Trade Secret and Confidential Information Capel has refused to sign an affidavit providing assurances about this very sensitive information, why he still has it, and whether he has used or will use it in the future.  He has also adamantly refused to allow a forensic examiner to delete these materials.  This has become an urgent matter to FullStory because FullStory recently learned that two (2) of its key clients that were previously serviced by Capel have either terminated their contract with FullStory or have indicated that they do not intend to renew their contracts with FullStory and are actively evaluating the technology offered by Capel's current employer, Contentsquare.  A third key enterprise client of FullStory just informed FullStory that Capel has been in contact with them.  Moreover, Capel still retains access to these three key clients' files, including copies of their master subscription agreements, orders, and organization

charts.  FullStory has serious concerns that Capel is violating terms of his ECA, the Handbook, and the ISP by directly or indirectly aiding his new employer in the solicitation of FullStory customers.

2.     In light of the foregoing, FullStory brings this action for permanent injunctive relief based on its claims for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, misappropriation of trade secrets pursuant to the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, and breach of contract.  This action also seeks compensatory, punitive, and exemplary damages, attorneys' fees, and other appropriate relief for the injuries caused by Capel's conduct, which appears to have been intentionally targeted at FullStory and its property with the intent to cause financial harm to FullStory and its property.

## PARTIES

3.     FullStory is a Delaware corporation with offices located in Atlanta, Georgia.

4.     Counter-Defendant Daniel Capel is an individual resident of Hall County, Georgia residing at 4583 Wingfield Way, Flowery Branch, Georgia 30542.

## VENUE AND JURISDICTION

5.     This Court has proper jurisdiction of the subject matter of this action under 28 U.S.C. § 1331 in that this action arises under the laws of the United States,

and specifically 18 U.S.C. §§ 1030 and 1836. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

7.       Moreover, Capel is subject to the jurisdiction and venue of this Court by virtue of the filing of his Complaint, in which he claims that he was defamed and retaliated against when FullStory sent his counsel and new employer a letter seeking the rightful protection of FullStory Trade Secrets and Confidential Information. Capel claims that his claims, based on very closely related facts, "are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution." Compl. at ¶11.

## **FACTUAL ALLEGATIONS**

**A.     FullStory Provides A Digital Experience Intelligence Platform In A Highly Competitive Market.**

8.       FullStory's business centers on an emerging technology that is focused on providing customers in-depth analytics and insights around their web visitors' and mobile application users' digital experience. FullStory's digital experience intelligence ("DXI") platform delivers a complete, retroactive view of how people interact with its clients' site or application. It is searchable, extensible, and

dynamically built to enrich the clients' tech-stack, align teams, and accelerate innovation.

9.     The DXI platform business is a highly competitive one, and FullStory has devoted substantial time, effort, and capital resources in developing and maintaining its relationships with clients, licensors, and suppliers, as well as in pursuing potential clients, licensors, and suppliers.

10.     FullStory's business operations, as a DXI platform which allows clients to capture, see, and integrate all of their quantitative and qualitative experience data in one place, involve the use of highly confidential FullStory Trade Secret Information, including, but not limited to: (a) confidential sales and marketing processes and strategies; (b) industry network contact information, including suppliers; (c) confidential pricing data; (d) margins and profitability related to product sales; (e) confidential client lists and files; (f) potential client information; (g) platform programming; (h) expansion and consolidation plans; (i) information regarding innovation and inventions; and (j) contract terms and templates.

11.     FullStory takes extensive efforts to maintain the secrecy of its Trade Secrets, including, but not limited to: (a) having all employees, including high level employees like Capel, enter into an Employment Covenants Agreement which defines Confidential Information and Trade Secrets;  (b) publishing an Employee

Handbook, a separate Information Security Policy, and training materials which obligate employees, as a condition of their employment, to protect FullStory Trade Secrets and Confidential Information; (c) prohibiting the disclosure of confidential or sensitive information to any third party without first entering into an acceptable Non-Disclosure Agreement; (d) advising employees to refrain from discussing FullStory Trade Secret and Confidential Information in a public setting where the parties may be overheard; (e) requiring employees to keep all laptops, cell phones and documents containing FullStory Trade Secrets and Confidential Information secure; and (f) establishing other procedures and protocols, as necessary, to protect confidential business and technical information.

**B.      Capel Was Employed At FullStory For Over Four Years As A Key Employee In Its Sales Division.**

12.     Capel began his employment with FullStory in June 2018 as the Company's first Enterprise Account Executive, wherein Capel developed a sales process focusing on accounts with large (over 5,000 employees) organizations.

13.     Capel quickly rose through the ranks at FullStory due to his success in sales, eventually promoted to the Vice President of Sales, Eastern Region position in July 2021.

14.     In his role as both an Enterprise Account Executive and the Vice President of Sales, Eastern Region, FullStory provided Capel with access to

FullStory Trade Secrets and Confidential Information and was responsible for, among other things, developing targeted sales strategies, reviewing internal costs, approving pricing, and managing major client accounts directly.

**C.    Capel's Employment Covenants Agreement.**

15.    On May 23, 2018, Capel entered into an Employment Covenants Agreement with FullStory and confirmed that the term of the Agreement applied beginning upon his first day of employment with the Company.  See **Exhibit [B** attached hereto.

16.    The ECA covers several issues, including trade secrets and confidential information, non-disclosure of customer information, non-solicitation of costumers, post-employment disclosure, and return of company property/materials.  *See id.*

17.    Specifically, under the Trade Secrets and Confidential Information provision, Capel agreed not to:

> … upon the termination of [Capel's] employment for any reason, (a) retain physical embodiments of Trade Secrets or Confidential Information, including any copies existing in any form (including electronic form) which are in [Capel's] possession or control, or (b) destroy, delete, or alter the Trade Secrets or Confidential Information without the Company's prior written consent.

*See id.* at Paragraph 2(b)(iii).

18.    Capel agreed that for one (1) year after his employment with the Company ended, he would not divulge or make accessible to any person or entity (i) the names of Customers, as defined in the ECA, or (ii) any information contained in Customer's accounts. *See id*. at Paragraph 3.

19.    Capel agreed that for one (1) year after his employment with the Company ended, he would not:

> … directly or indirectly, solicit any Customer of the Company for the purpose of selling or providing any products or services competitive with or directly substitutable for the Business. The restrictions set forth in this Section 4 apply only to Customers with whom [Capel] had Contact. Nothing in this Section 4 shall be construed to prohibit [Capel] from soliciting any Customer of the Company for the purpose of selling or providing any products or services competitive with the Business: (i) to a Customer that explicitly severed its business relationship with the Company; or (ii) which product line or service line the Company no longer offers.

*See id.* at Paragraph 4.

20.    Capel also agreed that for one (1) year after his employment with the Company ended, he would provide a copy of the ECA to his future employers and consented to the notification of his obligations by FullStory to these future employers. *See id.* at Paragraph 10.

21.    Capel further agreed that:

> Upon the termination of [his] employment for any reason or upon the Company's request at any time, [Capel] shall immediately

> return to the Company all of the Company's property, including, but not limited to, keys, passcards, credit cards, confidential or proprietary lists (including, but not limited to, customer, supplier, licensor, and client lists), rolodexes, tapes, laptop computer, software, computer files, marketing and sales materials, and any other property, record, document, or piece of equipment belonging to the Company.  [Capel] will not (i) retain any copies of the Company's property, including any copies existing in electronic form, which are in [his] possession or control, or (ii) destroy, delete, or alter any Company property, including, but not limited to, any files stored on a laptop computer, without the Company's prior written consent. The obligations contained in this Section shall also apply to any property which belongs to a third party, including, but not limited to, (i) any entity which is affiliated or related to the Company, or (ii) the Company's customers, licensors, or suppliers.

*See id.* at Paragraph 23.  Attachment A to the ECA defines the Restricted Period and specifically extends it by a year in the event that a court order is necessary to enforce the ECA: "in the event that the Company enforces this Agreement through a court order, the Restricted Period shall continue until the later of (i) one year after Your employment with the Company ends and (ii) one year after the effective date of the order enforcing this Agreement."  *Id.* at Attachment A, Paragraph F.

**D.    FullStory's Employee Handbook and Information Security Policy.**

22.    In addition, the Company also publishes an Employee Handbook and a separate Information Security Policy.  See **Exhibit C** and **Exhibit D** attached hereto.

23.    The Employee Handbook specifically provides the following regarding an employee's obligations concerning its Confidential Information:

**You've got access to confidential information:** Employees may, by virtue of their employment with the Company, obtain access to sensitive, confidential, restricted and proprietary information about the Company that is not generally known or made available to the public or competitors and that the Company has made reasonable efforts to keep confidential, including but not limited to financial records, customer or vendor records and files, referral or mailing lists, credit card numbers, and similar information whether stored electronically or in paper format.

**You can't use that information for anything other than to do your job.** Such confidential information shall be used solely by employees in the performance of their job duties for the Company and shall not be used in any other manner whatsoever during their employment. Employees shall not, without the prior written consent of the Company, use, disclose, divulge, or publish to others any such confidential information acquired in the course of their employment. This prohibition expressly includes such information in electronic form. Such confidential information is the exclusive property of the Company and under no circumstances whatsoever shall employees have any rights to use, disclose or publish to others such confidential information subsequent to the termination of their employment.

and

**Unauthorized use or disclosure of confidential information may result in discipline, up to and including immediate discharge, prosecution, or other available action.**

**If you leave, you need to return confidential information to us.** Upon termination of employment, employees must deliver to the Company immediately any and all confidential information, whether stored electronically or in paper format, including but not limited to all copies of such documents prepared or produced in connection with their employment with the Company that pertain to the Company's business or the employee's services for the Company, whether made or compiled by the employee or furnished to the employee in connection with such services to the Company. In addition, at termination, employees must return to the Company all of the Company's non-confidential property, documents, or electronic information.

This policy does not limit the common law and statutory rights of the Company.

*See* Ex. C at Pages 31-32.

24.     Capel   executed   the   Handbook's   Employee   Acknowledgment   and Agreement on July 10, 2020 and December 3, 2021.  True and correct copies of the Employee Acknowledgments are attached hereto as **Exhibits E and F**.

- 27 -

25.     The Employee Acknowledgment and Agreement specifically states,

"**MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS.**" *See id.*

26.     Under the "Basic Work Rules" of the Employee Handbook, the Company further provides:

> **Breach of Confidence or Security:** Because of the nature of our work, we cannot tolerate any breaches of our security measures or of our confidential business relationships. All employees are expected to honor the FullStory Security Policy (https://go.fs.team/sec-policy).

*See id.* at Page 27.

27.     In addition, the Company's separate Information Security Policy outlines various protocols implemented by FullStory to protect its Trade Secret and Confidential Information:

## 1. Purpose, Scope, and Organization

---

What is this document, why does it exist, what does it cover, and who is in charge of it?

This policy defines behavioral, process, technical, and governance controls pertaining to security at FullStory that all personnel are required to implement in order to ensure the confidentiality, integrity, and availability of the FullStory service and data ("Policy"). All personnel must review and be familiar with the rules and actions set forth below.

This Policy defines security requirements for:

- all FullStory employees, contractors, consultants and any other third parties providing services to FullStory ("personnel"),
- management of systems, both hardware and software and regardless of locale, used to create, maintain, store, access, process or transmit information on behalf of FullStory, including all systems owned by FullStory, connected to any network controlled by FullStory, or used in service of FullStory's business, including systems owned third party service providers, and
- circumstances in which FullStory has a legal, contractual, or fiduciary duty to protect data or resources in its custody.

In the event of a conflict, the more restrictive measures apply.

and

### No Backups, Use of Cloud Storage

Personnel may not configure work devices to make backups of device data. Instead, personnel are expected to operate primarily "in the cloud" and treat local storage on computing devices as ephemeral. Making a practice of keeping important work artifacts replicated into company-approved secure cloud storage (e.g. Google Docs) ensures that even in the event of a corporate device being lost, stolen, or damaged, such work artifacts will be immediately recoverable on a replacement device.

and

---

**Security and Privacy Training**

In order to ensure that FullStorians are trained to meet their security and privacy obligations, we have created a training program that assigns required courses based on ISMS role. All FullStorians are required to complete security awareness training.

LCSP is responsible for ensuring that all FullStorians are assigned the correct training courses and that all FullStorians complete their training in accordance with the schedule described below.

All FullStorians sign employee handbook agreeing to adhere to the ISMS. The program covers security awareness, policies, processes, and training to ensure that personnel are sufficiently informed to meet their obligations.

Topics include but are not limited to: application security, phishing, social engineering, GDPR, HIPAA, Privacy and other potential attack vectors that target employees, acceptable system use, reporting potential security

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

incidents, guidance on how to engage with external parties, new changes to our security policies and program, and the state of our security program.

Those most responsible for maintaining security at FullStory, including the security team itself, as well as key engineering/operations staff, undergo additional technical continuing education at least annually.

---

*See* Ex. D at Pages 2-3, 5, and 10.

**E.      End Of Capel's Employment And Subsequent Events.**

28.     Capel's employment ended with FullStory on July 31, 2022, after he refused to apologize or accept any consequences for his offensive and disruptive social media posts on the business and employment-focused platform LinkedIn, as well as Facebook, about the LGBTQ+ community.

29.     Capel filed his first charge with the EEOC on September 8, 2022, claiming religious discrimination.  *See* ECF No. 1-1.  Capel also alleged that FullStory had defamed him. *See id*.  FullStory and Capel were scheduled to mediate with the EEOC on January 23, 2023.

30.     On December 14, 2022, over four months after Capel's termination and several weeks before the mediation, Capel's counsel informed FullStory's counsel that, pursuant to the obligations contained within the ECA, Capel was notifying FullStory that he had accepted employment with a "reading engagement platform," that he provided his new employer with a copy of the ECA, and further stated that while Capel returned his laptop computer to the Company after he was terminated, Capel still maintained company documents on his personal iCloud server.  A true and correct copy of the email string between B. Pryor and S. Yoshor is attached hereto as **Exhibit G**.

31.     The December 14, 2022, email was the first time the Company learned about Capel's possession of such documents because Capel had not disclosed his possession of such information previously, and, importantly, Capel did not have permission to download and store FullStory confidential information and trade secrets to his personal iCloud server during his employment.  It was not clear how many documents were at issue or what they contained.

32.    Capel's continued possession of this information not only violates his ECA and FullStory policies, but also violates federal and state statutes that protect company trade secrets from misappropriation.

33.    From mid-December to mid-January, which covered the Christmas and New Years' holidays and a trial setting for Capel's counsel who was busy getting ready for trial, counsel for FullStory and Capel discussed how these confidential materials still in Capel's possession would be sent from Capel to a DropBox folder for FullStory's review.  Counsel agreed that after FullStory's review, they would determine the best way to remove materials in Capel's possession.

34.    While FullStory's counsel was working with the Company on how best to collect these documents and have them deleted from Capel's personal iCloud server, Capel's counsel emailed on January 3, 2023, informing the Company that Capel was no longer associated with the reading engagement platform, but rather, starting that same day, Capel began working for a direct competitor—Contentsquare—as a sales representative in the southeastern United States.  *See id.* Capel's counsel did not state whether Capel had provided Contentsquare with a copy of the ECA, as required by the ECA.  *See id*.

35.    In response, on that same day, January 3, 2023, FullStory's counsel instructed Capel's counsel to transfer all FullStory data to a Dropbox file so that

FullStory could review and determine next steps.  *See id.*  FullStory did not want to jump to any conclusions without seeing the data at issue.

36.     Further discussions between the parties ensued concerning the transfer of FullStory data, at which point it was relayed to the Company through Capel's counsel that Capel alleged the FullStory documents were "automatically" uploaded to his personal iCloud server when he used the documents during his employment. Capel claims that he downloaded such information "in order to use the full functionality of such laptops." Compl. at ¶51(b).

37.     Capel's excuse for uploading or downloading such information and retaining it is not well-founded or legitimate. Storing information on an iCloud server is not allowed by FullStory's Information Security Policy; and such uploading is never automatic.  *See* Ex. D at Page 5.

38.     FullStory's counsel received the Dropbox link on January 18, 2023, more than two (2) weeks after Capel had received the instructions to transfer all FullStory data to a Dropbox, and just five days before the EEOC mediation.  *See id.* Upon review, it became clear that Capel had retained hundreds of documents containing highly sensitive trade secret information, including a folder entitled "Clients" containing 99 subfolders for various clients with FullStory proposals, agreements, purchase orders, a file entitled "CONFIDENTIAL – The FullStory

Difference – DO NOT SHARE," and other information that is obviously very confidential to FullStory.  Capel's files also include FullStory form agreements, FullStory's banking information, and incentive compensation information for FullStory employees.  It was clear upon review that these materials were far more extensive and sensitive than FullStory had previously believed.

39.    Until FullStory was provided access to these documents, the Company had no idea that Capel's personal iCloud server contained so much sensitive information.  Since it discovered the extent of the documents that Capel improperly retained and after it became clear that the parties would not reach any settlement despite FullStory's best efforts, FullStory has repeatedly requested Capel to complete an affidavit or attestation and/or allow a forensic examination by an independent forensic examiner of his devices to determine whether or not information has been shared with any third party.  These are the same steps that FullStory has taken with other former employees who moved to competitors and were believed to have FullStory Trade Secrets and Confidential Information in their possession.  Despite the undisputed fact that Capel still has such information in his possession on his personal iCloud server, Capel has rejected every solution suggested by FullStory that would give the Company reassurance that Capel was not using the Trade Secrets and/or Confidential information to unfairly compete against

FullStory while working for Contentsquare. Capel refused to provide sworn assurances or allow a forensic examiner to review his devices and delete the FullStory Trade Secrets and Confidential Information.

40.     Instead of countering with reasonable solutions, Capel threatened and then filed a second EEOC Charge alleging retaliation based on FullStory's legitimate efforts to protect its Trade Secrets and Confidential Information. *See* ECF No. 1-3.

41.     FullStory's good-faith efforts to determine the best way of dealing with Capel's continued possession of its Trade Secrets and Confidential Information have been met with nothing but outrageous accusations about the Company's motives. Capel continues to refuse to take any steps to alleviate FullStory's legitimate concerns. After receiving the actual contents of Capel's personal iCloud server on January 18, 2023, and after the parties were unable to settle the allegations in Capel's first EEOC Charge on January 23, 2023, FullStory suggested various reasonable resolutions and continued to try to reach a resolution about these outstanding issues. Capel has uniformly rejected those efforts.

42.     In a nutshell, these are the key facts and issues:

- Capel retained hundreds of highly sensitive Trade Secrets and Confidential Documents from FullStory after he exited FullStory.

- Capel informed FullStory of this breach only months after the fact. When he informed FullStory, he intentionally omitted that he was about to begin working for a direct competitor of FullStory.

- Capel has ardently and continuously refused to sign an affidavit or attestation promising simply that he did not use or share the Trade Secrets and/or Confidential Information that he retained wrongfully and to confirm that he did not take any additional materials.

- In the past several weeks, two of FullStory's key customers for whom Capel owned the customer relationship have terminated their contract with FullStory and/or are actively evaluating the technology offered by Capel's new employer and a third has been contacted by Capel.

- Capel still has possession of the highly confidential FullStory Contracts with all three of those key FullStory customers.

- FullStory has serious concerns that Capel is violating the terms of his ECA by directly or indirectly aiding his new employer in the solicitation of FullStory customers.

43.    Because Capel refuses to cooperate, FullStory now has no choice but to seek assistance from the Court.

44.    In fact, there was and is no legitimate purpose for Capel to retain access to this FullStory Trade Secrets and Confidential Information.  Now that Capel is employed by a direct competitor in a similar position that he held while at FullStory, the Company is concerned Capel may have accessed these documents to unfairly compete against FullStory, especially because the ECA's prohibition against soliciting FullStory's customers will expire on July 31, 2023.

45.    FullStory's concerns have been heightened even more because of the recent information that it learned about the three key clients previously serviced by Capel during his employment at FullStory and about whom Capel has retained

confidential information including FullStory subscription agreements, orders and pricing, who either intend to end their business relationships with FullStory and/or may leave FullStory. **To be clear, Capel still possesses FullStory's Trade Secrets and Confidential Information, including client folders for at least ninety-seven (97) other FullStory clients.** In addition to the possession and potential use of this FullStory information, Capel is bound by a non-solicitation provision in the ECA that requires him to refrain from soliciting customers that he serviced while at FullStory for at least a full year after his termination.

46.     Upon information and belief, it is likely that at least two key clients have moved or will move their business to Contentsquare, and another has been contacted by Capel.  Upon information and belief, these moves are connected to Capel's employment at Contentsquare and his continued access to FullStory Trade Secrets and Confidential Information to improperly compete.

## COUNTERCLAIMS

### <u>COUNT I</u>
**Violation Of The Defend Trade Secrets Act, 18 U.S.C. § 1836**

47.    FullStory realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.    As a result of his employment and position of trust within FullStory, Capel was given limited, password protected access to FullStory's valuable Trade Secrets, including FullStory documents and information that Capel improperly uploaded and stored to his personal iCloud server while employed, which he continued to possess after his employment with FullStory ended, in violation of his ECA and FullStory's Employee Handbook.  In particular, the Company's client-specific proposals, orders, and agreements are unique to FullStory and not commonly known or available to the public.  These Trade Secrets are confidential and invaluable to FullStory and Capel's possession of such information presents a substantial (and unfair) advantage to a competitor as it includes information necessary to underbid FullStory.  As a result, the information constitutes Trade Secrets within the meaning of 18 U.S.C. § 1836 *et. seq.*

49.    The FullStory Trade Secrets misappropriated by Capel derive independent economic value, actual or potential, from not being generally known to

other persons who can obtain economic value from their disclosure or use. FullStory takes steps that are reasonable under the circumstances to maintain the secrecy of its trade secret information, including security measures such as unique credentials and passwords, as well as two-factor authentication, to access the Salesforce client information database.

50.     Capel misappropriated FullStory's Trade Secrets when he improperly uploaded and stored FullStory Trade Secret and Confidential Information to his personal iCloud server during his employment and continued to possess (and potentially access) these sensitive documents and information after his employment with FullStory ended. Because of his current employment with a direct competitor, FullStory is fearful that Capel has used and will continue to use the Trade Secrets and/or Confidential Information to unlawfully solicit FullStory's clients and to underbid FullStory's sales quotes.

51.     Capel did not request or receive FullStory's consent, express or implied, to appropriate, use, copy, or disclose FullStory's Trade Secrets for Capel's own use or benefit or for the use or benefit of any other entity.

52.     The acquisition, use or disclosure, or threatened use or disclosure, of FullStory's Trade Secrets by Capel entitles FullStory to permanent injunctive relief and damages.

53.     Upon information and belief, at all material times, Capel has acted willfully, maliciously, and in bad faith with the intention to cause irreparable financial and reputational harm to FullStory.

54.     The acts and threatened acts of misappropriation and intentional and malicious misuse of FullStory's Trade Secrets have caused and will continue to cause irreparable harm to FullStory as well as damages.

55.     Capel's misappropriation of FullStory's Trade Secrets entitles FullStory to immediate injunctive relief and damages, pursuant to 18 U.S.C. § 1836(b)(3).

56.     Further, in light of Capel's willful and malicious actions, FullStory is entitled to attorneys' fees, exemplary damages of double actual damages, unjust enrichment, and/or a reasonable royalty, in an amount to be proved at trial.

## COUNT II
**Misappropriation Of Trade Secrets Pursuant To Georgia Trade Secrets Act**

57.     FullStory realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58.     As a result of his employment and position of trust within FullStory, Capel was given limited, password protected access to FullStory's valuable Trade Secrets, including FullStory documents and information that Capel improperly

uploaded and stored to his personal iCloud server while employed, which he continued to possess after his employment with FullStory ended, in violation of his ECA and FullStory's Employee Handbook. In particular, the Company's client-specific proposals, order, and agreements are unique to FullStory and not commonly known or available to the public. These Trade Secrets and Confidential Information constitutes trade secrets under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 *et seq.*

59.     The FullStory Trade Secrets misappropriated by Capel derive independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use. FullStory takes steps that are reasonable under the circumstances to maintain the secrecy of its Trade Secret information, including security measures such as unique credentials and passwords, as well as two-factor authentication, to access the client information database.

60.     Capel misappropriated FullStory's Trade Secrets when he improperly uploaded and stored such information to his personal iCloud server during his employment and then continued to possess (and potentially access) the Company's documents and information after his employment with FullStory ended. Because of his current employment with a direct competitor, FullStory is fearful that Capel has

and will continue to use the trade secret information to unlawfully solicit FullStory's clients and to underbid FullStory's sales quotes.

61.    Capel did not request or receive FullStory's consent, express or implied, to appropriate, use, copy, or disclose FullStory's Trade Secrets for Capel's own use or benefit or for the use or benefit of any other entity.

62.    The acquisition, use or disclosure, or threatened use or disclosure, of FullStory's Trade Secrets by Capel entitles FullStory to immediate and permanent injunctive relief and damages.

63.    Upon information and belief, at all material times, Capel has acted willfully, maliciously, and in bad faith with the intention to cause irreparable financial and reputational harm to FullStory.

64.    The acts and threatened acts of misappropriation and intentional and malicious misuse of FullStory's Trade Secrets have caused and will continue to cause irreparable harm to FullStory as well as damages including but not limited to actual loss, unjust enrichment, and/or a reasonable royalty, in an amount to be proved at trial.

65.    Capel's misappropriation of FullStory's Trade Secrets entitles FullStory to injunctive relief and damages, pursuant to O.C.G.A. § 10-1-762.

66.     Further, in light of Capel's willful and malicious actions, FullStory is entitled to attorneys' fees, pursuant to O.C.G.A. § 10-1-764, and exemplary damages of double actual damages, pursuant to O.C.G.A. § 10-1-763.

**COUNT III**
**Breach of Contract**

67.     FullStory realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     The Employee Handbook requires employees to immediately deliver any and all FullStory property, including Confidential Information upon termination of employment.

69.     The ECA further memorialized this obligation and is a valid, enforceable contract.  The ECA also requires Capel, during a period of one (1) after the end of his employment with FullStory, to provide all future employers a copy of the ECA.  FullStory has met all conditions precedent to and otherwise complied with the contract, as applicable.

70.     Capel has breached the terms of the ECA and Employee Handbook by, among other things, failing to return all FullStory Trade Secrets and Confidential Information upon termination of his employment, as well as failing to provide his current employer—Contentsquare—with a copy of the ECA.  And, upon information

and belief, Capel breached the terms of the ECA by soliciting the Company's customers prior to the expiration of the non-solicitation provision and/or accessing FullStory's Trade Secrets, Confidential Information, and/or Customer Information as defined by the ECA.

71.   As a direct and proximate result of Capel's breaches, FullStory has suffered and will continue to suffer damages in an amount to be proved at trial.

72.   FullStory seeks permanent injunctive relief requiring specific performance of the confidentiality and non-disclosure provisions of the ECA and Employee Handbook.

## COUNT IV
### Attorney's Fees And Costs Pursuant To O.C.G.A. § 13-6-11

73.   FullStory realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74.   Capel has acted in bad faith, has been stubbornly litigious, and has caused FullStory to incur unnecessary trouble and expense with respect to the underlying actions described above.

75.   More specifically, Capel has acted in bad faith by improperly obtaining and possessing FullStory Trade Secrets and Confidential Information.

76.     Therefore, pursuant to O.C.G.A. § 13-6-11 and Section 14 of the ECA, FullStory is entitled to recover attorneys' fees and costs it has incurred and will incur in this action.

## PRAYER FOR RELIEF

WHEREFORE, FullStory respectfully requests that judgment be made and entered in its favor and against Capel on all counts, and that the Court grant the following relief:

a.     Enter a verdict and judgment in favor of FullStory on all counts in this Complaint;

b.     Enter an order permanently enjoining Capel, his agents, and any persons or entities in active concert or participation with him, from directly or indirectly:

   i.     Possessing, using, or divulging to any person any FullStory Trade Secrets or Confidential Information, including without limitation, any information concerning customers, licensors, suppliers, employees, or pricing of FullStory;

   ii.     Possessing, using, or divulging to any person any FullStory Trade Secrets or Confidential Information to compete with FullStory or to solicit business from any customer of FullStory;

iii.     making, participating in, or communicating on any Contentsquare proposal to any prospective or current customer of FullStory because Capel has not complied with the terms of the ECA;

iv.     using, destroying, disposing of, disseminating, altering, or disclosing any information or property in Capel's possession, custody, or control belonging to FullStory or copied, duplicated, recorded, or otherwise taken from FullStory or any of FullStory's subsidiaries or affiliates, including but not limited to, information stored on computers, external hard drives, and/or portable storage devices (including but not limited to any documents, correspondences, emails, flash drives, thumb drives, cloud storage, and/or USB devices) without FullStory's direction for such deletion or destruction;

v.     using, destroying, disposing of, disseminating, altering, or disclosing any document or information that in any way relates to the allegations in this suit, including but not limited to, any computers, external hard drives, and/or portable storage devices (including but not limited to any documents, correspondences, emails, flash drives, thumb drives, cloud storage, and/or USB devices);

vi.     using, destroying, disposing of, disseminating, altering, or disclosing any documents or information that evidences or reflects, or is in

any way related or connected to the misappropriation or use by Capel of any property or information belonging to or copied, duplicated, recorded, or otherwise taken from FullStory, including its subsidiaries or affiliates;

c.      Enter an order requiring Capel and all those in active concert or participation with him, to deliver through an independent forensic examiner to counsel for FullStory all documents taken from FullStory or containing any information belonging or related to FullStory, including all copies of any document and/or information that Capel has provided to, or used for the benefit of, Contentsquare;

d.      Award FullStory actual and compensatory damages in an amount to be determined at trial;

e.      Award FullStory punitive and exemplary damages in an amount to be determined at trial, pursuant to, among other bases, O.C.G.A. § 10-1-763(b);

f.      Award FullStory all costs and attorneys' fees it incurs in the prosecution of this lawsuit, pursuant to, among other bases, O.C.G.A. §§10-1-764 and 13-6-11 and ECA Section 14;

g.      Award FullStory pre- and post- judgment interest as allowed by law; and

h.      Grant such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

FullStory hereby demands a trial by jury on all claims so triable.

Respectfully submitted, this 25th day of July, 2023.

/s/ Justin K. Victor
Justin K. Victor
Georgia Bar No. 105516
victorj@gtlaw.com
Megan C. Eckel
Georgia Bar No. 542556
megan.eckel@gtlaw.com
GREENBERG TRAURIG, LLP
Terminus 200 – Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212

Shira R. Yoshor*
Pennsylvania Bar No. 329396
yoshors@gtlaw.com
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, Pennsylvania 19103
Telephone: (215) 988-7800
Facsimile: (215) 988-7801

*Motion for admission pro hac vice
forthcoming*

*Counsel for Plaintiff FullStory, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DAN CAPEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | 1:23-cv-02458-MHC-JEM |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FULLSTORY, INC., SCOTT VOIGT, | ) | |
| and GABBY SIRNER-COHEN, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I served a true and correct copy of the within and foregoing **DEFENDANT FULLSTORY, INC.'S PARTIAL ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS OF DEFENDANT FULLSTORY, INC.** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following Counsel of Record:

Bobby G. Pryor
Dana G. Bruce
PRYOR & BRUCE
302 N. San Jacinto St.
Rockwall, TX 75087
bpryor@pryorandbruce.com
dbruce@pryorandbruce.com

Jennifer K. Coalson
Evan P. Drew
PARKS, CHESIN & WALBERT, PC
75 14th St. NE, Suite 2600
Atlanta, GA 30309
(404) 873-8000 (Phone)
jcoalson@pcwlawfirm.com
edrew@pcwlawfirm.com

I further certify that I prepared this document in 13-point Century Schoolbook font and compiled with the margin and type requirements of this Court.

This 25th day of July, 2023.

_/s/ Justin K. Victor_

Justin K. Victor

*ACTIVE 689028563v2*